UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

SMITH WHOLESALE COMPANY,     )
INC., *ET AL*                )
                             )
V.                           )          NO. 2:03-CV-30
                             )
R. J. REYNOLDS TOBACCO COMPANY   )


REPORT AND RECOMMENDATION

The plaintiffs, wholesale distributors, have sued the defendant, a cigarette

manufacturer, for pricing discrimination under § 2(a) of the Clayton Act, as amended

by the Robinson-Patman Act, codified at 15 U.S.C. § 13(a). The defendant has moved

for summary judgment on two bases: that its prices are "functionally available" to

every distributor and therefore are not discriminatory, and that the plaintiffs have failed

to prove causation of "antitrust injury."[1] The motion has been referred by the District

Judge to the Magistrate Judge for a report and recommendation. A hearing was held

on February 8, 2005.


*I. FUNCTIONAL AVAILABILITY*

The plaintiffs are wholesale distributors of cigarettes, among other things;

tobacco products constitute at least fifty percent of their sales to retailers. They

---

[1]Doc. 164.

purchase cigarettes from various manufacturers, of which defendant is one, and then resell or distribute those cigarettes to retail outlets, such as grocery stores, convenience stores, and the like. The plaintiff-wholesalers sell virtually every brand of cigarettes, from those of the old-line large manufacturers, such as R. J. Reynolds and Phillip Morris, to those of relatively new manufacturers, sometimes colloquially referred to as "off brands," and referred to in this litigation as "fourth tier" cigarettes. In addition to its premium or highest-priced cigarettes, the defendant also manufactures "savings brand"[2] cigarettes which compete with the fourth tier cigarettes.

In response to a shrinking share of the "savings brand" cigarette market, doubtlessly attributable in large measure to the explosive growth of the fourth tier cigarette market, the defendant adopted its Wholesale Partners Program ("WPP" or "program") in April 2000. The ostensible purpose of the WPP is to provide a financial incentive for its wholesalers to sell to retailers more of defendant's savings brand cigarettes relative to those of other manufacturers. The WPP is a multi-tiered scheme that initially had three levels (level I, level II and level III), which ultimately evolved into ten levels: level I, levels II-A through II-H, and level III. A wholesaler receives either a front-end discount or a back-end rebate in an amount determined by the level "earned" by that wholesaler in the WPP. At level I, the lowest level, the wholesaler receives the smallest possible discount. At the highest level, level III, the wholesaler

---

[2]A euphemism for "relatively cheap."

2

earns the highest possible discount/rebate.

The mathematical concept underlying the WPP would have given Albert Einstein a headache. First, in each state the defendant ascertained what *percentage* of each wholesaler's total sales of savings brand cigarettes consisted of RJR's savings brand cigarettes. Each wholesaler was then ranked in descending order, with the wholesaler having the highest percentage of RJR cigarettes listed at the top, and the wholesaler selling the smallest percentage of defendant's products (relative to the total sales of savings brand cigarettes) at the bottom. The defendant thereupon listed the *volume* of its savings brand cigarettes sold by each of those distributors. It is important to note that the distributor listed at the top, which sold the highest percentage of defendant's products, did not necessarily sell the highest *volume* of defendant's products; indeed, the distributor with the highest percentage of defendant sales very easily could have been the distributor that sold the lowest volume of defendant's products.

After determining the volume of defendant's cigarettes sold by each distributor in the descending order discussed in the preceding paragraph, defendant's marketing wizards ascertained the *total volume of RJR savings cigarettes sold in each state*. Defendant then selected as its state target the RJR *percentage* of that wholesaler whose volume sales, when added to all those above it, equaled eighty-five percent (or as close thereto as possible) of defendant's total wholesale volume in the state. Defendant

3

thereafter calculated a "share-of-savings" target for each wholesaler, using the state

targets described above. The target was stated in terms of defendant's "savings

brands" as a percentage of the total sales of cheap cigarettes sold by a distributor. For

those wholesalers doing business in more than one state (and there were several),

defendant had yet another formula that adjusted a multi-state wholesaler's target goals

to reflect the different states in which that wholesaler does business. The closer a

wholesaler comes to the goal established for it, the higher the incentive level applicable

to it. And the higher the incentive level, the lower the price it pays for defendant's

cigarettes. It is at first difficult to understand, and even more difficult to describe in

words, but it does have mathematical logic to it, and the resulting state target is

intended to capture eighty-five percent of the volume of defendant's savings brand in

any particular state.

     As noted, the incentive level in which any wholesaler was placed determined

the amount that wholesaler paid for defendant's savings brand cigarettes. Obviously,

some wholesalers participated at higher levels than others, which meant that they

purchased their cigarettes from defendant at a cheaper price. This price differential

resulted in this litigation.

     Plaintiffs allege that the defendant's pricing scheme is discriminatory and,

although it may be facially available to all distributors of defendant's products, the

percentage goals in fact are arbitrary, unrealistic, and impossible for the distributors to

meet. Not surprisingly, defendant insists otherwise.

At the heart of this litigation lies the doctrine of "functional availability" that had its genesis in *FTC v. Morton Salt Co.*, 334 U.S. 37 (1948). In *Morton Salt*, the defendant-manufacturer adopted a discount program based upon the *volume* of the manufacturer's product sold by a distributor. As a practical matter, that volume discount precluded a sizeable number of small distributors from obtaining the advantage of the discounts since they lacked the ability to match the volume sales of much larger distributors. Although the discount program was *theoretically* available to all distributors, as a practical matter it was not, and thus the doctrine of "functional availability" arose. Paraphrased, if a discount program purports to be all-inclusive, but as a practical matter cannot be obtained by all distributors, then it is a discriminatory pricing scheme that violates the Robinson-Patman Act.

As an initial matter, which side has the burden of proof as far as "functional availability" is open to question; there are cases on both sides of this issue. The Court instructed the parties to file supplemental briefs on this issue, and they have now done so. But as far as this Motion for Summary Judgment is concerned, it really makes no difference which party has the burden of proof; under Fed.R.Civ.P. 56(c), only if there are no genuine issues as to any material facts, and only if the moving party is entitled to a judgment as a matter of law, is summary judgment proper. Moreover, the non-moving party must be indulged with all possible favorable inferences from the facts.

5

*Plott v. Gen. Motors Corp.*, 71 F.3d 1190 (6th Cir. 1995). Therefore, irrespective of who might have the burden of proof at a trial on the merits, summary judgment is precluded if either party demonstrates that there is a genuine issue of material fact. In this case, there are some relatively serious disputes regarding material facts but, for purposes of this motion, the Court accepts as true plaintiffs' version of those facts.

Defendant points out that no case has ever held to be illegal an incentive discount program that is based on a *percentage* of a market share, as opposed to the *volume* of purchases. Indeed, defendant argues that the Robinson-Patman Act was adopted to forestall the evil of a large buyer obtaining a competitive edge over small buyers due to the former's economic power that results from the quantities of goods it is able to purchase by virtue of its size: "The legislative history reveals that the aim of the [Robinson-Patman Act] is to prevent a large buyer from gaining discriminatory preferences over the small buyer solely because of the large buyer's greater purchasing power. [Citations omitted.]" *Bouldis, et al. v. U.S. Suzuki Motor Corp., et al.*, 711 F.2d 1319, 1326 (6th Cir. 1983). Defendant argues that inasmuch as its discounts are in no way related to the volume of purchases, but rather are based on a percentage-increase in the sale of its products, it really is outside the area of concern that Robinson-Patman addresses. Plaintiffs, on the other hand, argue that there is nothing in the Act itself that restricts its prohibition against discriminatory pricing to "large versus small." Apparently, the Supreme Court agrees; in a case involving a more

6

favorable price given to a *small* retailer, the Court held:

> While, as noted, the immediate and generating cause of the Robinson-Patman amendments [to the Clayton Act] may have been a congressional reaction to what were believed to be predatory uses of mass purchasing power by chain stores, neither the scope nor the intent of the statute was limited to that precise situation or set of circumstances. Congress sought generally to obviate price discrimination practices threatening independent merchants and businessmen, presumably from whatever source.

*F.T.C. v. Sun Oil Co.,* 371 U.S. 505, 520 (1963).

To the extent defendant argues that Robinson-Patman does not, and could not, apply to discriminatory pricing based on percentages of market share, the Court is constrained to agree with the plaintiffs. If there is a discrimination or differential in price between different purchasers of the same commodities, and if the effect of that discrimination *may be* to substantially lessen competition, then there is a *prima facie* violation of the Robinson-Patman Act, regardless of the mechanics of that discrimination. *See, Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 444 n. 10 (1983).

Therefore, Robinson-Patman applies to discriminatory pricing schemes even if the price differentials are based on percentage of market share as opposed to volume purchases. Nevertheless, defendant insists that its "best price" is as functionally available to each plaintiff as it is to any of that plaintiff's competitors, and the relative sizes of the competitors are utterly irrelevant – all are treated the same in a market-

share-based program. Defendant gives the following hypothetical example: Assume that defendant offers a three percent discount if its savings brand cigarettes account for twenty percent of a wholesaler's sales. If Wholesaler "A" sells a total of ten thousand cartons a week, two thousand of which are defendant's savings brand cigarettes, that wholesaler will receive the three percent discount. Wholesaler "B," of much smaller size, sells only one thousand cartons per week, but if two hundred of those cartons are defendant's cigarettes, Wholesaler "B" likewise will receive the three percent discount. As the example shows, defendant's discount program does not favor large volume buyers of its cigarettes.

Plaintiffs argues that they are not challenging market-share-based programs *per se*. Rather, they argue that the state targets in defendant's program are not realistic and therefore *functionally unavailable* to them. In response to defendant's argument that any given discount is functionally available to any distributor, irrespective of that distributor's size, plaintiffs argue that those goals are unattainable by them because of the nature of the areas in which they do business. Specifically, plaintiffs argue that they sell to retailers in relatively rural "poor" areas in which the demand for cheaper, fourth tier cigarettes is high and, inasmuch as the distributors cannot affect consumer demand, as a practical matter they cannot attain the percentage goals set by defendant *unless* they simply curtail or eliminate sales of fourth tier cigarettes to their retail customers.

In answer to this argument, defendant posits that the wholesalers have a choice; it may be a difficult choice, but nevertheless it is a choice. And if they can attain defendant's marketing goal by curtailing their sales of fourth tier cigarettes, that is a choice they have the right to make. On the other hand, they have an equal right not to curtail or eliminate theirs sales of fourth tier cigarettes and receive a lower discount on defendant's products. In either event, plaintiffs have a choice. In support of its position that having to make a choice does not make defendant's discount functionally unavailable, defendant cites a number of cases. In *Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105 (3rd Cir. 1980), defendant sold its gasoline to various wholesale distributors, including the plaintiff. After the defendant Texaco unilaterally altered the location where plaintiff could load his delivery trucks with defendant's gasoline, which resulted in higher distribution costs for plaintiff, the plaintiff filed suit claiming that this amounted to discriminatory pricing in violation of the Robinson-Patman Act. The Third Circuit, in upholding the dismissal of plaintiff's Robinson-Patman Act claim, stated:

> The [Supreme] court [in *Morton Salt*] emphasized that a major purpose of the Robinson-Patman Act was to eliminate the competitive advantage of a large buyer "over a small buyer solely because of the large buyer's quantity purchasing ability." [Citation omitted.] In the case before us, it is the distributors, not Texaco, who determine where to place their bulk storage plants, and it is the distributors, not Texaco, who decide which retail stations they will supply. Texaco has no control over those decisions.

637 F.2d at 122.

9

In *Labrador, Inc. v. Iams Co.*, 1995 WL 714454 (C.D. Cal. 1995), an unreported district court case from the Central District of California, the plaintiff retailers sued the manufacturer under 18 U.S.C. § 13(d). The district court stated, in dismissing the plaintiff's claim:

> If a manufacturer makes certain terms and conditions available to a party, that party cannot maintain claims against the manufacturer/seller under Sections 2(d) and 2(e) of the Robinson-Patman Act where that party does not accept the terms and conditions and others reap the benefits of such terms and conditions.

*Id.,* at *6.

In *Capital Ford Truck Sales, Inc., v. Ford Motor Co.*, 819 F.Supp. 1555 (N.D. Ga. 1992), a Ford truck dealership sued Ford Motor Company under Robinson-Patman for granting price concessions to those dealers which sold ten or more trucks in a single transaction. The plaintiff claimed that it did not qualify for the maximum discount that other dealers enjoyed because it did not sell to large quantity purchasers. The district court, in dismissing this aspect of plaintiff's suit, said:

> This appears, however, to be the result of a marketing decision by Capital Ford to concentrate on sales to smaller volume customers as opposed to large fleet purchasers. Plaintiffs do not allege that Defendant in anyway restricted the customers to whom Capital Ford could sell, and Plaintiffs have adduced absolutely no evidence that the purchase quantity discounts offered under the [discount] program were not realistically available to all dealers if they chose to bid larger volume buyers. [Citing *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983).]

819 F.Supp. at 1579.

In response to defendant's argument that plaintiffs can meet defendant's marketing goals if they choose to do so, plaintiffs suggest that this "choice" is not only unpalatable, it is self-destructive inasmuch as most of their retail customers prefer to buy all their stock-in-trade from a single distributor. Therefore, so plaintiffs argue, if they curtail their sales of fourth tier cigarettes to the retail customers, those retail customers will take their *entire* business to another wholesaler. In other words, plaintiffs argue that an *unreasonable,* draconian business decision is not a "choice" in the real sense of that word, and that they should not be compelled to surrender business, or perhaps even risk their very existence, to obtain the best discounts from defendant. And thus we arrive at the crux of this litigation. Because defendant's program is based on a percentage of sales, it is not presumptively suspect as would be a volume-based plan; it is available to any distributor, small or large. But attaining the optimum target entails marketing decisions which, according to plaintiffs, could be disastrous for their business: surrendering or curtailing their sales of fourth-tier cigarettes which, at best, will affect their bottom lines and, at worst, their existence. Plaintiffs insist that as a practical matter they cannot afford to make the decision or choice thrust upon them by defendant, and therefore their targets are is functionally unavailable.

Plaintiffs cite to the Court *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745 (1st Cir. 1994), and suggests that it stands for the proposition that "plaintiff need not give up the advantages of its importer contract in

order to obtain the most favorable price."[3]  However, the only language in the case that

mentions this matter reads as follows:

> Caribe also argues that the favored treatment, as a practical matter, was not "available" because BMW AG insisted that it give up various advantages of its importer's contract in order to obtain it.  We cannot tell from the complaint, however, just what those advantages were and how they related to the practical "availability" of the favorable treatment given other retailers.  Thus, we cannot say, at this time, whether or not Caribe will be able to prove that the favorable price and terms, as a practical matter, were not available.  At this stage, however, Caribe has sufficiently alleged they were not.

   19 F.3d at 752.

Respectfully, the language from the case itself does not support the inference which

plaintiffs seek to draw from it; the court was only reciting the plaintiff's argument.

   Plaintiffs also cite *National Dairy Products Corp. v. Federal Trade Commission*, 395 F.2d 517 (7th Cir. 1968).  In *National Diary*, the manufacturer-seller sold its

products at a lower price to large chain and group store customers, and was sued under

Robinson-Patman.  The manufacturer argued that the smaller, independent buyers could

have obtained the more-favored discounts if they had "joined together into cooperative

groups."  The Seventh Circuit stated:

> We also cannot accept [defendant's] argument that the disfavored independent should have joined voluntary or cooperative groups and thus obtained higher discounts.  The Robinson-Patman Act does not force them to sacrifice their independence.  One of the reasons for its enactment was to protect the independents from the chains and other

---

[3]Plaintiffs' Argument Binder, Plaintiffs' Outline 3, p. 7.

large buying groups. [Citation omitted.]

395 F.2d at 523.

Plaintiffs also cite *Calumet Breweries, Inc. v. G. Heileman Brewing Co., Inc.*, 951 F.Supp. 749 (N.D. Ind. 1994), in support of their position that the reasonableness of a choice is a legitimate inquiry in any market-share-based discount program. In *Calumet,* the beer manufacturer gave discounts to buyers based on the quantities of the manufacturer's beer purchased by those buyers. In other words, the discount system was a *volume*-based system, presumptively suspect under the Robinson-Patman Act by virtue of *Morton Salt, supra.* In *Calumet,* the manufacturer came up with a rather innovative defense: it suggested that the defendant had adequate warehouse space to purchase the volume of beer needed to obtain the most-favored discount. In other words, the defendant argued that plaintiff should buy the beer in large quantities and then store in a warehouse what it could not immediately sell. With respect to this argument, the district court held:

> Moreover, the evidence tends to discount [the manufacturer's] contention that it would be a reasonable business decision for [the buyer], because of its physical storage capacities and economic resources, to purchase enough beer to obtain the maximum discount. [The manufacturer] argues that [the buyer] does not do so because it has decided to maximize sales of competing brands, such as Anheuser-Busch, rather than aggressively promoting sales of [the manufacturer's] products. According to [the manufacturer], [the buyer] should compete with [competing distributors] for structuring its purchases: obtaining the maximum discount by buying more than a month's supply of beer, warehousing it, and then selling from inventory in the following month(s).

13

> Nothing in the Robinson-Patman Act or the cases inter-
> preting it suggest that [the buyer's] decision to emphasize
> other brands and remain a (relatively) small seller of [the
> manufacturer's] products *ipso facto* means [the manufac-
> turer] may charge [the buyer] a higher price . . . . [Quota-
> tion from *Morton Salt* omitted.]

951 F.Supp. at 755.

In response to plaintiffs' argument that harsh, unreasonable or even self-destructive choices effectively make defendant's discounts functionally unavailable to them, defendant submitted several cases for the Court's consideration:

In *American Tara Corp. v. International Paper Co.*, 1981 WL 375572 (N.D. Ill. 1981), the defendant-manufacturer instituted a discount program based upon a percentage of past purchases of its product which, paradoxically, tended to favor *small* purchasers. Plaintiff-purchaser argued that defendant's rebate program was not functionally available to it "because plaintiff could not buy that amount from defendant without placing itself in extreme jeopardy." *Id.,* at *2. The district court stated:

> As plaintiff notes, no court has decided that a purchaser
> must choose "between deserting its valued traditional
> sources of supply or suffering discriminatory prices"; no
> court has been presented with facts identical to these,
> however, and, in similar situations, courts have sanc-
> tioned programs which imposed choices as the one con-
> demned by plaintiff in this case. In *Shreve Equipment,*
> *Inc. v. Clay Equipment Corp.*, 1981-1 CCH Trade Cases
> P64, 016 (N.E. Ohio 1981), the court held that, if the
> plaintiff could ever see the challenged discounts if plain-
> tiff's president and chief shareholder had resigned from
> his job with defendant, the discounts were functionally
> available to plaintiff. In *Edward J. Sweeney & Sons, Inc.*
> *v. Texaco*, 637 F.2d 105 (3rd Cir. 1980), the court upheld
> a pricing formula which required the plaintiff to choose
> between moving its storage plant and changing the retail

14

stations it supplied or paying higher prices. In *United Banana Co. v. United Fruit Co.*, 245 F.Supp. 161 (D. Conn. 1965), the court approved a program even though the plaintiff would have had to build rail siding facilities to qualify for the lower price.

The holdings in those cases reflect the rationale for the functional availability defense and control our holding in this case. The plaintiffs in those cases and in this case could have qualified to receive the lower prices but chose based on their business judgment, to suffer competitive injury if their competitor's purchased at the lower price rather than assume the disabilities or risks in the commitment necessary to purchase at the lower price.

Since plaintiff's competitors had to make the same decision, Tara's choice, not defendant's program, was responsible for the price discrimination. Therefore, the rebates which defendant gave plaintiff's competitors were functionally available to plaintiff and did not violate the Robinson-Patman Act.

*Id.,* *3.

Thus, so defendant argues, even if the plaintiff-distributors are confronted with a *hard* choice, even a potentially self-destructive choice, each and every one of them face that same choice and there is no discrimination.

Firstly, the Court disagrees with the plaintiffs that defendant's decision to set the target goals on a statewide basis was arbitrary and improper. To be sure, there are two "arbitrary" factors in defendant's calculation. Using a state to set its targets, as opposed to some other geographical or demographical area, was arbitrary, but no other geographical area would have been any less arbitrary. And using eighty-five percent as the baseline target also could be said to be arbitrary, since defendant could have chosen ninety percent, or seventy-five percent, or any other percentage. But picking a number

15

fifteen percent *below* defendant's market share in a given state was not unreasonable. Plaintiffs essentially argue that defendant should have set the targets on a per-distributor basis which, of course, would be tantamount to having no market-share-based incentive program at all. These targets treat all distributors equally; each has the same opportunity to achieve higher discount levels. From the fact that unpleasant, even draconian, business decisions might be required, it does not follow that the discount scheme is *discriminatory*.

Admittedly, the "reasonableness of the choice" issue is troublesome, primarily because this Magistrate Judge appreciates plaintiffs' argument and is sympathetic to it. But if the reasonableness or unreasonableness of business decisions is a factor that must be considered with respect to functional availability of a market-share-based discount program, then such a discount program always will be as inherently suspect as a volume-based discount program. Any given distributor could claim that it could not meet a market-share goal because it would be required to alter its business in some fashion which the distributor subjectively determines to be unreasonable. No seller could ever know if its program was lawful under Robinson-Patman; the legality of any market-share-based discount program only could be ascertained with respect to each and every buyer after a jury decides whether the business decisions forced upon that buyer were reasonable or not. Although plaintiffs argue they are not challenging market-share-based discount programs *per se*, in reality they are, simply because any distributor could challenge the target goal as unreasonable *as to it*; and if that distribu-

tor prevails, the entire discount program would collapse as unworkable. The result would be "tailor-made" discounts which themselves presumptively violate the Robinson-Patman Act.

The district judge in *Calumet* commonsensically held that a manufacturer could not compel a small business to grow into a big business merely to obtain a discount from the manufacturer. But that is not the situation before this Court. Here, the distributors can remain small if they wish, or expand their territories if they wish; unpleasant though it may be, they can choose to sell less fourth tier products to increase the relative percentage attributable to their sales of defendant's products. And this choice is equally available to every distributor, small and large.

What is so frustrating and unpleasant about this case is that it is virgin territory; there are no cases squarely on point, and many of the cases cited by both parties, for one proposition or another, are heavily fact-dependent. As noted earlier, and as forcefully pointed out by the defendant, there are *no* cases that involve market-share-based discounts. Thus, this Court is largely on its own, sailing into unchartered waters with only a compass and no Global Positioning System.

To be candid, this Magistrate Judge's sympathies lie with the wholesalers and believes that defendant's discount program is "unfair." But capitalism often is unfair, and sometimes even cruel. Some countries have at various times adopted other economic systems that purport to be "fair," but capitalism with all its faults has proven to be superior to all the others.

17

> "In any competitive economy we cannot avoid injury to
> some of the competitors. The law does not, and under the
> free enterprise system it cannot, guarantee businessmen
> against loss. That businessmen lose money or even go
> bankrupt does not necessarily mean that competition has
> been injured. H.R. Rep. No. 1422, 81st Cong., 1st Sess.
> 5-6."

*F.T.C. v. Sun Oil Co.*, 371 U.S. 505, 519 (1963).

Defendant's program is designed to promote its financial welfare at the expense of that of the wholesalers. Perhaps it is unfair, but it is not illegal.

It is recommended that defendant's Motion for Summary Judgment be GRANTED on the basis that its discounts are functionally available to all distributors.

## II. CAUSATION/ANTITRUST INJURY AND DAMAGES

Defendant also moves for summary judgment on the basis that no plaintiff has proven causation between the alleged antitrust violation and an injury suffered by any plaintiff.[4] Defendant also insists that no plaintiff has proven damages with the required degree of specificity.

As to nine plaintiffs, their proof regarding damages is simply "lost discounts," the amount of the highest discounts received by any of their competitors under defendant's program. The remaining eleven plaintiffs seek to prove their damages by both the "lost discount" method as just described, as well as proof of lost profits.

---

[4]Somewhat confusingly, various cases refer to "causation" and "antitrust injury" interchangeably.

18

With respect to the nine plaintiffs who have proof only of lost discounts, their claims fail as a matter of law. Proving only lost discounts amounts to *automatic damages* which are unequivocally prohibited by the Supreme Court in *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981). In *J. Truett Payne*, Chrysler Corporation adopted an incentive program under which it paid its dealers a bonus based on the number of car sales made in excess of the goal or target set for that dealer by Chrysler. Claiming that Chrysler set its goal higher than that of its competitors, and claiming further that such amounted to pricing discrimination, the dealership filed suit against Chrysler under § 2(a) of the Robinson-Patman Act. The issue before the Supreme Court was the "appropriate measure of damages in a suit brought under § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act." *Id.,* at 559. The Court of Appeals reversed a jury verdict in favor of the plaintiff and ordered that the case be dismissed, holding that a plaintiff must prove (1) a violation of the antitrust laws, (2) cognizable injury attributable to the violation, and (3) at least the approximate amount of damage. Apparently the district court allowed the jury to infer both the *existence* and amount of injury from mere proof of discrimination; however, the court of appeals rejected such "automatic damages." *Id.*, at 560. Before the Supreme Court, plaintiff again argued that it was entitled to automatic damages in the amount of the price discrimination and that the jury should be permitted to infer the requisite injury and damage from a showing of a substantial price discrimination. *Id.,* at 561. The Supreme Court flatly stated that it disagreed. *Id.* Firstly, the Supreme Court noted that

19

§ 2(a) is a "prophylactic statute" and a violation occurs if the result of any discriminatory pricing scheme *may be* substantially to lessen competition; there is no requirement in § 2(a) that the discrimination actually harmed competition. *Id.,* at 561-562.

Damages, however, that result from a violation of § 2(a) are awarded under § 4 of the Clayton Act, which is a "remedial statute":

> To recover treble damages, then, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent. *Perkins v. Standard Oil Co.,* 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969) (plaintiff "must, of course, show a causal connection between the price discrimination in violation of the Act and the injury suffered.") It must prove more than a violation of § 2(a), since such proof establishes only that injury *may* result.

451 U.S. at 562.

These nine plaintiffs have offered proof only of "lost discount," without any showing that they in fact suffered an "antitrust injury." Proof of lost discounts is precisely the type of automatic damages prohibited by *J. Truett Payne.* These nine plaintiffs have established neither causation nor damages.

Therefore, apart from the recommendation that the entire suit be dismissed for the reasons set forth in Section I of this report, it is recommended that the claims of these nine plaintiffs, Affiliated, Andalusia, Bates, Church Point, Corso, Dixie, Huntsville, McCarty-Hull, and Yakima, should be DISMISSED.

The eleven remaining plaintiffs assert damages based on both "lost discounts" *and* "lost profits." The matter of lost discounts has been discussed in the

preceding paragraphs, and for those reasons it is recommended that proof of lost discounts be DISALLOWED as to these eleven plaintiffs. With respect to their claims based on lost profits, however, defendant contends that these plaintiffs simply have presented no competent evidence that they have sustained any damages. In this regard, defendant argues that plaintiffs' expert, Mr. Folsom, has relied upon statements made to him by representatives of these various plaintiffs, who in turn relied upon the statements of their sales representatives, who further in turn relied upon statements made to them by retailers concerning how those retailers were doing less business with the plaintiffs as a result of the higher prices charged for defendant's products.

First of all, in an order entered in this case regarding a motion *in limine* filed by defendant with respect to Mr. Folsom's testimony, it is noted that the two-tier hearsay problem has been obviated and, with respect to the one-tier hearsay problem, the Court has allowed that testimony. Further, in another order the Court has determined that Mr. Folsom's opinions are competent expert opinions under *Daubert* and F.R.E. 702. Although proof of *antitrust injury* – causation, if you will – must be proven by a preponderance of the evidence, actual proof of damages is not as rigorous in an antitrust action simply because of the nature of the beast itself. *See, Shreve Equip., Inc. v. Clay Equip. Corp.,* 650 F.2d 101, 106 (6th Cir. 1981). The Court believes that Mr. Folsom's testimony, for the reasons just stated, establishes both causation and damages with the degree of specificity required for both.

Therefore, in the event the District Judge disagrees with the recommendation

in Part I of this report and holds that this suit should be allowed to go forward on the question of functional availability, then it is respectfully recommended (1) that defendant's Motion for Summary Judgment with respect to nine of the plaintiffs, Affiliated, Andalusia, Bates, Church Point, Corso, Dixie, Huntsville, McCarty-Hull, and Yakima, be GRANTED, and that defendant's Motion for Summary Judgment with respect to the eleven remaining defendants be DENIED, except with regard to "lost discounts."

Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985). If a party files objections to this report and recommendation, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission. The opposing counsel shall file his/her response to the objections within five business days of the date the objections are filed.

Respectfully submitted,

_____
s/ Dennis H. Inman
United States Magistrate Judge

_____

.4

22