UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


SMITH WHOLESALE CO., INC., <u>ET AL.</u>          )
                                                 )
v.                                               )          NO. 2:03-CV-30
                                                 )
R. J. REYNOLDS TOBACCO COMPANY                   )


# M E M O R A N D U M   O P I N I O N

This Robinson-Patman Act price discrimination complaint is before

the Court to consider the Report and Recommendation ("R&R") of the United

States Magistrate Judge which recommends that the Motion for Summary

Judgment filed by the defendant, R. J. Reynolds Tobacco Company ("RJR"), be

granted on the basis that the defendant's discounts are functionally available to all

distributors. [Doc. 313]. The plaintiffs have filed objections to this R&R. [Docs.

318, 319, and 321].

28 *U.S.C.* § 636(b)(1) provides, in pertinent part:

Within ten days after being served with a copy, any party
may serve and file written objections to such proposed
findings and recommendations as provided by rules of
court. A judge of the court shall make a *de novo* determi-
nation of those portions of the report or specified pro-
posed findings or recommendations to which objection

> is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

This court's *de novo* review of the magistrate judge's report is both statutorily and constitutionally required. *United States v. Worley*, 193 F.3d 380, 383-384 (6th Cir. 1999); *United States v. Shami*, 754 F.2d 670, 672 (6th Cir.1985).

After careful consideration of the record as a whole, this Court makes the following findings of fact and conclusions of law. For the purpose of deciding this motion for summary judgment, the Court will adopt the plaintiffs' statement of facts filed on December 17, 2004. [Doc. 287], and other facts submitted in the plaintiffs' Memorandum.

## PLAINTIFFS' STATEMENT OF UNDERLYING FACTS

RJR is engaged in the manufacture and sale of cigarettes in the United States and its territories. RJR is the second largest cigarette manufacturer in the United States and had a national market share of around 21% prior to its July 30, 2004 merger with the United States operations of Brown & Williamson. The newly formed Reynolds American, Inc., now has a market share of around 31%. RJR's major premium brands include Camel and Winston. RJR's principal discount brand is Doral. RJR sells its tobacco products primarily to wholesalers (including distribu-

2

tors), large retail organizations, including chain stores, and the armed services. RJR competes with other cigarette manufacturers in the United States market for tobacco products, including Philip Morris USA, Inc. ("PM"), Lorillard, Liggett and all other cigarette manufacturers, often referred to by RJR as "AOMs."

Cigarette brands generally are divided into different price tiers. "Premium" or "super premium" brands generally are the highest priced. RJR's Camel and Winston brands are premium brands. Other examples of premium cigarettes include PM's Marlboro and Lorillard's Newport. Second and third-tier cigarettes are, in most cases, considered discount brands and are collectively referred to as "value-priced" or "savings" brands. Fourth-tier, or "deep discount" cigarettes generally occupy the lowest price tier. Fourth-tier brands are primarily manufactured by cigarette manufacturers other than RJR.

Plaintiffs are wholesalers who sell a full line of products, including cigarettes, to grocery and convenience stores and other retail outlets in various states. Cigarette products constitute 50% or more of their sales revenues. Most plaintiffs have purchased directly from RJR and many have distributed RJR's products for more than 50 years. As full-line wholesalers, plaintiffs also supply their retailer-customers with all other major manufacturers' cigarettes as well as fourth-tier (deep discount) and other non-RJR cigarettes. RJR's 21 largest wholesalers, out of approximately 680

3

wholesalers, account for 50% of RJR dollar sales volume.

In August, 2000, RJR revised its wholesale pricing structure by implementing its Wholesale Partners Program ("WPP"). The WPP established a three-level pricing system (ranging from Level 1 (the least favored) to Level 3 (the most favored)) that based off-invoice price discounts and back-end monies (rebates paid to distributors at the close of each quarter) on a comparison of the distributor's sales of RJR's savings brands to its sales of non-RJR savings brands. To attain Level 2 and 3 pricing, a distributor's RJR savings brands sales must reach even higher percentage quotas. RJR modified the WPP at various times from August 2000 to present. During the first through the fourth quarters 2003, only approximately 8% of RJR distributors qualified for the WPP's best discount and rebates (Level 2 "H" plus full Level 3).

From the second quarter 2002 through the third quarter 2003, Level 2 contained eight price categories: "A" through "H" . Level 2 "A" was set at the minimum Level 2 RJR share of savings ("SOS") brands threshold to 1.5% above this minimum SOS threshold. Only when a distributor exceeded its Level 2 "A" SOS quota by 30.1% would it then qualify for Level 2 "H" back-end monies. In July 2003, RJR modified the WPP to further reduce the Level 2 and 3 back-end monies available to a Level 2 "A" distributor.

4

From August, 2003 through the first quarter 2004, all monies earned under RJR's WPP were based solely on a distributor's RJR share of total *savings* brands; beginning in the second quarter 2004, RJR adopted a "share of market" approach where WPP quotas were based on the distributor's RJR sales as a percentage of all cigarettes it sold. Other than that modification, the second quarter 2004 version of the WPP stayed basically the same as the prior quarter's version.

The WPP's maximum per carton price difference between Level 1 and the best price from August 2000 to the present was approximately:

| Effective Date | Max Price Difference |
|---|---|
| August 2000 - April 2001 | $0.55 |
| May 2001 - May 2002 | $0.50 |
| June 2002 - December 2002 | $0.57 |
| January 2003 - June 2003 | $0.85 |
| July 2003 - September 2003 | $1.12 |
| October 2003 - March 2004 | $0.75 (post injunction) |
| April 2004 - present | $0.74 |

Even distributors receiving intermediate pricing under the WPP suffer a substantial price disadvantage. For example, in July 2003, a Level 2 "A" distributor paid $0.40 per carton more than Level 2 "H" competitors who also received full Level 3 monies. Because RJR's highest share quotas and its more favored prices have not been achievable by plaintiffs, all have been classified as Level 1 distributors (some for the entire complaint period) under the WPP.

On January 31, 2003, Smith Wholesale filed suit against RJR alleging that (i) the WPP constituted illegal price discrimination under the Robinson-Patman Act (15 U.S.C. § 13(a)) and (ii) RJR wrongfully terminated its direct purchasing status in retaliation for raising antitrust complaints about the WPP to its retail customers. This Court enjoined RJR's termination of Smith Wholesale's direct purchasing status on February 7, 2003. On February 18, 2003, Rice Wholesale was added as a Plaintiff seeking identical relief. On March 4, 2003, this Court also enjoined RJR's termination of Rice Wholesale's direct purchasing status. RJR has appealed both termination injunctions to the United States Court of Appeals for the Sixth Circuit. RJR's appeals have been argued and are currently pending before the Sixth Circuit.

On June 11, 2003, nine current plaintiffs joined Smith Wholesale and Rice Wholesale in filing an amended complaint with this Court. Ten plaintiffs sought and obtained from this Court a preliminary injunction (granted on August 6, 2003) against the 1% discount reduction at Level 1 under the 2003 WPP. RJR appealed this Court's order granting the preliminary injunction to the Court of Appeals for the Sixth Circuit, and a Stay of the Preliminary Injunction was granted on September 24, 2003. RJR's appeal of this injunction was argued and is currently pending before the Sixth Circuit.

Since this Court's August 6, 2003 preliminary injunction, additional

6

plaintiffs have joined this action and there are now a total of 20. Discovery is now closed. RJR filed its motion for summary judgment against all of the plaintiffs' claims and the claims of the States of Tennessee and Mississippi. RJR's motion has been fully briefed and is currently pending before this Court.

Plaintiffs' price discrimination claim is brought under Section 2(a) of the Robinson-Patman Act, 15 *U.S.C.* § 13(a). To establish a *prima facie* case, plaintiffs must prove that: (1) RJR's cigarette sales to plaintiffs and their competitors are "in interstate commerce"; (2) the sales involve RJR cigarettes of "like grade and quality"; (3) the sales discriminate in prices[1] among these competing distributors; and (4) the discrimination substantially lessens competition and causes antitrust injury to plaintiffs. *Schwartz v. Sun Co., Inc.*, 276 F. 3d 900, 903-904 (6th Cir.2002). Plaintiffs seek damages for the loss of profit, customers, sales, goodwill and business value that resulted from RJR's discriminatory pricing. Plaintiffs further seek permanent injunctive relief against this discrimination. The States are seeking injunctive relief on behalf of their consumers, wholesalers, and manufacturers and to prevent alleged injury to the economies of their states.

Aside from the damages caused by the discriminatory pricing, the other central issue in dispute relates to the issue of what is commonly known as "functional

---

[1] Simply put, this means a difference in price.

availability." Plaintiffs contend that the issue is whether they and most or all of RJR's around 700 wholesale distributors could, as a practical matter, qualify for the best price under the WPP. Plaintiffs contend that the WPP's share targets for obtaining the best price are not realistically available for many reasons. Plaintiffs' contentions in this regard include: (1) the demand for RJR's products is insufficient among plaintiffs' available retailer-customer base; (2) wholesalers do not control and hence cannot materially increase customer demand for RJR's products; (3) wholesalers cannot materially alter their RJR-share figures by discounting sales of RJR-competitor products without a substantial loss of sales and customers; (4) disfavored wholesalers paying the highest prices for RJR products cannot realistically compete for coveted high RJR share retail accounts; and (5) even when there is a demand for RJR products, RJR does not provide plaintiffs with all the RJR products to satisfy their customers' orders. Plaintiffs have not made any "choice" to emphasize fourth-tier or other non-RJR brand over RJR'S products. They simply respond to the demand of their customers.

## CONCLUSIONS OF LAW

As an initial matter, the plaintiffs contend that certain of the Court's

findings in its preliminary injunction memorandum opinion should have been considered in deciding the defendant's motion for summary judgment. However, it is clearly settled that the purpose of a preliminary injunction is simply to preserve the status quo, and that findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). Therefore, this Court's findings of fact and conclusions of law made in conjunction with its order granting the plaintiffs a preliminary injunction are not binding on this Court in addressing the defendant's motion for summary judgment.

The defendant contends that summary judgment is appropriate in this case because RJR's discounts are functionally available to the plaintiffs. The plaintiffs contend that summary judgment is inappropriate in this case because whether or not the defendant's discounts are functionally available is clearly a jury question. The use of the functional availability theory to demonstrate the lack of an essential element of the plaintiffs' case, i.e. price discrimination, is technically not an affirmative defense, but the negation of an element of the plaintiff's case. See *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, n. 17 (5th Cir.1998). If an

essential element of the plaintiff's case is negated, summary judgment is appropriate.

The theory of "functional availability" is explained by the Sixth Circuit in *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1326 (6th Cir. 1983):

> The practice of conditioning price concessions and allowances upon the customer's purchase of a specific quantity of goods will not give rise to a Robinson-Patman violation if the concessions are available equally and functionally to all customers. See *Federal Trade Comm. v. Morton Salt Co.*, 334 U.S. 37, 42, 68 S.Ct. 822, 826, 92 L.Ed. 1196 (1948); *Shreve Equipment, Inc. v. Clay Equipment Corp.*, 650 F.2d 101, 105 (6th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981); *Mowrey v. Standard Oil Company of Ohio*, 463 F.Supp. 762, 775-76 n. 17 (N.D.Ohio 1976), aff'd without opinion, 590 F.2d 335 (6th Cir.1978). See generally 16C Von Kalinowski, BUSINESS ORGANIZATIONS § 27.04 (1982). Further, a claim of price discrimination will not lie if the buyer failed to take advantage of a price concession which was realistically and functionally available. See *Shreve Equipment, Inc.*, supra, 650 F.2d at 105. The legislative history reveals that the aim of the Act is to prevent a large buyer from gaining discriminatory preferences over the small buyer solely because of the large buyer's greater purchasing power. See *Federal Trade Comm. v. Henry Broch & Co.*, 363 U.S. 166, 168-69, 80 S.Ct. 1158, 1160-61, 4 L.Ed.2d 1124 (1960); *Morton Salt Co.*, supra, 334 U.S. at 43, 68 S.Ct. at 826.

In *Bouldis*, the district court found that Suzuki's various promotional concessions and allowances were practically and realistically available to Bold-Morr, Inc., a former Suzuki motorcycle dealership whose officers and sole stockholders were

10

Pete Bouldis and Norman Morris.  In addition, the testimony of Bouldis revealed that he had cash flow and inventory problems at times which prevented him from participating in the promotional sales. Therefore, the Sixth Circuit found that,  by his own admission, there was no causal link between Suzuki's practices and Bouldis' alleged injuries but rather his inability to participate was attributable to his own business problems.  The Sixth Circuit concluded that conditioning price concessions and allowances on the purchase of a specific quantity of goods is allowed if concessions were made available equally and functionally to all customers.  *Id.*

Several other circuits have addressed the "availability" theory as well. In *Edward J. Sweeney & Sons Co. v. Texaco, Inc*., 637 F.2d 105 (3d Cir. 1980), the Third Circuit found that customer pickup allowances from the seller's uniform zone delivered pricing system based upon the distance from the seller's delivery point was nondiscriminatory because it was available to all customers using  a nondiscriminatory formula, even though different customers paid different prices.  The Fifth Circuit found, in *Metro Ford Truck Sales*, 145 F.3d at 326, that price discrimination did not exist, and that no violation of the Robinson-Patman Act occurred,  because Metro was treated the same as all other Ford dealers with respect to CPA program for the same customer, and products of like grade and quality.  In  *Comcoa, Inc. v. NEC Tels., Inc.*, 931 F.2d 655 (10th Cir. 1991), the Tenth Circuit found that there could be no recovery

if the challenged discount was functionally available to the plaintiff and the program was evenly administered.

To the extent that there is an "availability" defense, it will fail if the lower price is not "practically" available to all competing customers. Discounts must be available not only in theory but in fact to be practically available. See *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1025- 26 (2d Cir. 1976). ("equal opportunity" is required; "even when a seller has a dual pricing system, if the lower price is available to all purchasers, not only in theory but in fact, there is no violation of § 2(a)")

Discounts that have been held to not be functionally available because they were discounts in theory but not in fact are:

1. Quantity discounts. See *FTC v. Morton Salt Co.*, 334 U.S. 37 (1948) (holding that quantity discounts are not functionally available to many small buyers);

2. When the purchaser was not told about the discount. See *Caribe BMW, Inc. v. Bayerische Motoren Werke*, 19 F.3d 745 (1st Cir. 1994) (favorable prices not practically available if the buyer was not told that it would receive the same prices as customers

purchasing from different facility of supplier should buyer agree to purchase from that facility); and

3. When the purchaser was not permitted to participate in the program. See *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499 (11th Cir. 1989) (recognizing the validity of availability defense, but finding it inapplicable because the plaintiff was not given the opportunity to buy the lower-priced item).

None of these examples apply to the plaintiffs' situation because this case does not involve a quantity discount, the plaintiffs' were told about the discount, and the plaintiffs were permitted to participate in the program. The Court FINDS that RJR's discount is available to all customers using a nondiscriminatory formula, even though different customers may pay different prices, and that there is no evidence that the program was not evenly administered. Therefore, the Court FINDS that RJR's discount was functionally available to the plaintiffs in both theory and in fact.

The plaintiffs cite *Caribe,* 19 F.3d at 752 for the proposition that "plaintiff need not give up the advantages of its importer's contract in order to obtain the most favorable price." However, *Caribe* really states:

> The emphasized language says that Caribe did not know that its competitors were receiving favored treatment. And, we do not see how ordinarily one could say that a seller has made favored treatment "available" to a disfavored cus-

tomer if the disfavored customer does not know about the favored treatment. See, e.g., *Alterman Foods, Inc. v. F.T.C.*, 497 F.2d 993, 1001 (5th Cir.1974); *Mueller Co. v. F.T.C.*, 323 F.2d 44, 46-47 (7th Cir.1963), cert. denied, 377 U.S. 923, 84 S.Ct. 1219, 12 L.Ed.2d 215 (1964); *Century Hardware Corp. v. Acme United Corp.*, 467 F.Supp. 350, 355-56 (E.D.Wis.1979).

<u>Caribe also argues that the favored treatment, as a practical matter, was not "available" because BMW AG insisted that it give up various advantages of its importer's contract in order to obtain it. We cannot tell from the complaint, however, just what those advantages were and how they related to the practical "availability" of the favorable treatment given other retailers.</u> Thus, we cannot say, at this time, whether or not Caribe will be able to prove that the favorable price and terms, as a practical matter, were not available. At this stage, however, Caribe has sufficiently alleged that they were not.

 Our conclusion is that Caribe's complaint states a valid Robinson-Patman Act claim, in respect to price discrimination under Robinson-Patman Act § 2(a), and for similar reasons, under the Robinson-Patman Act sections that deal with payments for services, furnishing services, and brokerage payments. 15 U.S.C. § 13(b), (d)-(e). Although Caribe's pleadings regarding these other Robinson-Patman Act sections are rather sparse, they are sufficient to give BMW AG and BMW NA notice of the substance of Caribe's complaint.  (emphasis added)

Id. at 752.   Therefore, *Caribe* does not hold what the plaintiffs assert but merely

addresses the sufficiency of the complaint.

The plaintiffs also cite *National Dairy Products Corp. v. F.T.C.*, 395 F.2d 517, 523 (7th Cir. 1968) for the proposition that " 'the Robinson-Patman Act does not force [plaintiffs] to sacrifice their independence' in order to receive the highest discounts." *National Dairy* was a proceeding on a petition of a dairy product distributor to set aside an order and decision of the Federal Trade Commission. The Seventh Circuit held that where a dairy product distributor operated in 35 states and it was typical to have volume discount schedules in effect at various operations, the order of the Federal Trade Commission requiring it to cease from unlawful price practices was not an abuse of discretion in view of the showing that the practices had occurred in widespread areas over a long period of time. The Seventh Circuit concluded:

> We also cannot accept National's argument that the disfavored independents should have joined voluntary or cooperative groups and thus obtained higher discounts. The Robinson-Patman Act does not force them to sacrifice their independence. One of the reasons for its enactment was to protect the independents from the chains and other large buying groups. *Federal Trade Commission v. Anheuser-Busch, Inc.*, 363 U.S. 536, 543-544, 80 S.Ct. 1267, 4 L.Ed.2d 1385; Rowe, Price Discrimination Under the Robinson-Patman Act (1962), pp. 11-23.

Id. at 523.

The Court FINDS that National Dairy is not on point with this case because that case involved volume discounts and there has been no suggestion that these plaintiffs join voluntary or cooperative groups and sacrifice their independence.

In addition, the plaintiffs cite *Calumet Breweries, Inc. v. G. Heileman Brewing Co., Inc.*, 951 F.Supp. 749 (N.D.Ind. 1994), in which a beer wholesaler brought an action challenging the legality of a brewer's quantity discount program. The Court in *Calumet* stated:

> Moreover, the evidence tends to discount Heileman's contention that it would be a reasonable business decision for Calumet, because of its physical storage capacities and economic resources, to purchase enough beer to obtain the maximum discount. Heileman argues that Calumet does not do so because it has decided to maximize sales of competing brands, such as Anheuser-Busch, rather than aggressively promoting sales of Heileman products. According to Heileman, Calumet should compete with Central by structuring its purchases: obtaining the maximum discount by buying more than a month's supply of beer, warehousing it, and then selling from inventory in the following month(s).
>
> Nothing in the Robinson-Patman Act or the cases interpreting it suggests that Calumet's decision to emphasize other brands and remain a (relatively) small seller of Heileman products ipso facto means Heileman may charge Calumet a higher price:
>
> The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages except

16

> to the extent that a lower price could be justified by reason
> of a seller's diminished costs due to quantity manufacture,
> delivery or sale, or by reason of a seller's good faith effort
> to meet a competitor's equally low price. *Morton Salt*, 334
> U.S. at 43, 68 S.Ct. at 826. (emphasis added)

Id at 755.

*Calumet* is also not on point with this case because this case does not involve volume

discounts which permit a large buyer to secure a competitive advantage over a small

buyer because of the large buyer's quantity purchasing ability.

The plaintiffs cite *Boise Cascade Corp*., 107 F.T.C.76, 184(1986) rev'd

on other grounds, *Boise Cascade Corp. V. FTC*, 837 F.2d 1127(D.C. Cir. 1988),

contending that the FTC rejected the "functional availability defense because it was

impractical for dealers to change their business in order to qualify for discriminatory

discounts." In that case, Boise, a distributor of office products, was ordered to cease

accepting from any supplier, in particular six manufacturers, a net price for office

products that is lower than the price at which the supplier sells the products to other

retailers with whom Boise competes. The Commission ruled that Boise violated the

Robinson-Patman Act by knowingly receiving wholesaler discounts on goods it sold

at retail in competition with other dealers.

According to Boise, any injury to the dealers could have been avoided

since the lower prices which it enjoyed were also functionally available to them

because:

(1) If they performed wholesale functions, as does Boise, they are entitled to the wholesale discount;

(2) Discounts equal to the wholesale discounts on large purchases, and discounts on private label goods, are available;

(3) Buying groups and cooperatives can obtain wholesale discounts; and

(4) Competitors of the six manufacturers offer dealers the same or greater discounts as Boise now obtains.

The FTC concluded that Boise's claims are both factually and legally incorrect.


In *Boise*, the FTC cites *Shreve Equipment, Inc.v. Clay Equipment Corp*., 650 F.2d 101 (6th Cir.), cert. denied 454 U.S. 897 (1981), concluding that the court held that a discount was available, but only because the purchaser "did not have to alter its independent purchasing status to receive the discount, as was the case in *Dayco*." Id. at 107. The FTC concluded that the discount structures employed by the six manufacturers were designed to reward wholesalers for the functions which they perform and to prevent dealers from obtaining the wholesale discount despite <u>their performance of equivalent functions,</u> and that this structure ensures that the wholesale discount is not available to dealers who compete with Boise.

Finally *Dayton Rubber Co.*, 66 F.T.C. 423, rev'd on other grounds, *Dayco Corp. V. FTC*, 362 F.2d 180 (6th Cir. 1966), is not on point with the facts of this case. In that case, FTC rejected the argument that no price discrimination had occurred where lower prices were available to all "sub-jobbers" if they formed jobber groups. The FTC held that lower prices are unavailable where a purchaser must alter his purchasing status before receiving them. In this case, the defendant has not suggested that the plaintiffs alter their independent purchasing status to receive the discount.

Therefore, four of the five cases cited by the plaintiffs stand for the proposition that the plaintiffs do not have to alter their independent purchasing status to receive the discount. Not one of the five cases cited by the plaintiffs addresses plaintiffs' selling status or plaintiffs' assertion that Section 2(A)does not require plaintiffs to change their business structure, reconfigure their customer base, or undertake an expensive and risky business plan.

Although the plaintiffs contend that RJR's discounts are not functionally available to them because of the demands of their customers, applicable case law does not support the plaintiffs' conclusion that the demands of a purchaser's customer can render a discount functionally unavailable. Courts have refused to find discrimination when the buyer's inability to take advantage of the best discount was within the

control of the buyer, such as poor credit, management choices, decisions not to hold inventory, or particular marketing strategies. See *Bouldis*, 711 F.2d at 1327; *Shreve*, 650 F.2d at 105; *Edward J. Sweeney*, 637 F.2d at 121; *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 643 (9th Cir. 1969).

The Court FINDS that the undisputed fact that an outside influence, not in the control of RJR, i.e. plaintiffs' customer demands, frustrated their performance does not render the discount functionally unavailable. Therefore, because RJR's discount was functionally available, under the undisputed facts of this case, the defendant has demonstrated the lack of an essential element of the plaintiffs' case, i.e. price discrimination.

In this case, the Court also FINDS that there is no causal link between RJR's practices and the plaintiffs' alleged injuries. Plaintiffs contend that they did not make a voluntary choice to emphasize fourth-tier or other non-RJR brand over RJR'S products, but that they have simply responded to the demands of their customers. Therefore, by their own admission, the plaintiffs' inability to participate in WPP is attributable to an outside influence over which RJR had no control. In effect, the plaintiffs seek to reap the rewards of the WPP without furthering the purpose of that program, i.e., increasing the demand for RJR products.

The Court FINDS that, because the plaintiffs did not take advantage

of a lower price or discount which was functionally available on an equal basis, no

price discrimination has occurred.  In the alternative, the Court  FINDS that any

alleged discrimination was not the proximate cause of the plaintiffs' injuries.

An appropriate order shall issue.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE